IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JOSHUA TILLER                                                          PLAINTIFF

v.                         Civil No. 4:15-cv-04040

ROGER WISE, Health Service Administrator,
Correct Case Solutions (CCS); DR. MICHAEL
McALISTER, CCS; JANET MYERS, CCS;
DR. MARK VIEGAS, CCS; and CONNIE MASON, CCS               DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights case filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and

(3)(2016), the Honorable Susan O. Hickey, United States District Judge, referred this case to the

undersigned for the purpose of making a report and recommendation.

At issue in this case is whether the Plaintiff was denied adequate medical care while

incarcerated at the Southwest Arkansas Community Correction Center (SWACCC), located in

Texarkana, Arkansas. The case is before me on a Summary Judgment Motion (ECF No. 44) filed

by Defendants.  On September 14, 2016, a hearing was held to allow Plaintiff to orally respond to

the Motion.  For the reasons set forth below, I recommend that the Motion (ECF No. 44) be granted

in part and denied in part.

### (1).  Background

In 2009 or 2010, Plaintiff fell thirty feet off a roof and then tumbled 70 to 90 feet down a

rocky, sloped embankment.  *Defendants' Exhibit* (hereinafter *Defts' Ex.*) C at 9.[1]  He sustained

---

[1]Exhibit C is the Plaintiff's depositions.  Citations to it are to the deposition page number and not the CM/ECF page number.

injuries to his shoulders, neck, arms, knees, legs, and back, and also had internal injuries. *Id.* at 10. Plaintiff has no memory of the fall. *Id.*  Plaintiff testified that he continues to have problems with his neck, legs, upper middle back, lower middle back, lower back, rotator cuff, and hips. *Id.* at 69-71.

Plaintiff's parole was revoked and he was sentenced to a period of incarceration in the Arkansas Community Correction (ACC).[2]  On April 23, 2014, Plaintiff was transferred from the Hot Spring County Detention Center to the SWACCC.

Transported with the Plaintiff were his prescription medications including antibiotics to help him fight off a viral infection in his lungs, chest, throat, and head, and prescriptions for meloxicam for pain relief, Nexium (esomeprazole) for gastroesophageal reflux disease (GERD), and Prozac, for mental disorders. *Defts' Ex.* C at 22.  The intake officer at the SWACCC, refused the medications informing the Plaintiff that he would be prescribed necessary medication by the medical personnel at the SWACCC.

Plaintiff was seen at intake by licensed practical nurse (LPN) Melissa Stoner, on April 23, 2014. *Defts' Exs.* E at 1 & D at 1-10.  Nurse Stoner noted the Plaintiff's health history including his orthopedic concerns, his psychiatric history, and his current medications. *Id.*  Plaintiff reported having been previously diagnosed with Hepatitis C. *Defts' Exs.* E at 2 & D at 8.  A Hepatitis blood panel was ordered. *Defts' Exs.* E at 2 & D at 11-13.  The blood test showed that Plaintiff had an above high normal value for the Hepatitis C virus antibody. *Id.*

On April 30, 2014, Plaintiff testified he found out how to submit a request for an interview with the Health Services Administrator (HSA), Roger Wise. *See also Defts' Ex.* C at 62.  Plaintiff

---

[2]Formerly, the Arkansas Department of Community Correction.

testified that HSA Wise worked for Correct Care Solutions and was in charge of the medical department at SWACCC.

In his request for an interview, Plaintiff testified he complained that he had been in the facility for nine days and had not been provided his prescribed medications or screened by a doctor at intake. *See Doc.* 1 at 11. In response, HSA Wise told the Plaintiff he would be seen by a doctor. *Id.* Plaintiff testified that he believed HSA Wise disregarded the fact that he was under the care of a physician when he arrived at the SWACCC. Plaintiff maintains that HSA Wise failed to properly supervise, direct, and train his medical staff so that residents were not taken off medication prior to a physical examination by a doctor.

Plaintiff was examined by Nurse Jane Ann Frye on May 1, 2014. *Defts' Exs.* E at 2 & D at 18. Plaintiff requested to be put back on the medications he was prior to his arrival at the SWACCC. *Id.* Nurse Frye advised the Plaintiff that he would need to be seen by a physician and that he should return to the infirmary if his symptoms increased. *Id.*; *see also Defts' Ex.* C at 63-64.

Approximately a week after he arrived, Plaintiff submitted another request for an interview with HSA Wise. Plaintiff told HSA Wise about the predicament he was in. Plaintiff was called up to HSA Wise's office. Plaintiff testified HSA Wise just told him to keep waiting and he would be seen by a doctor. Plaintiff testified he submitted another request for an interview with HSA Wise. In response, HSA Wise said that he would be seen by a doctor.

On May 16, 2014, Plaintiff was seen by Dr. Michael McAlister for an initial evaluation. *Defts' Exs.* E at 2 & D at 19-30. Plaintiff testified this was a few days after he spoke with HSA Wise. In Plaintiff's view, since he arrived at the unit with current prescription medications he should have been seen immediately after his arrival or his medications continued until he was evaluated by medical staff at the unit.

Plaintiff testified that Dr. McAlister did not perform any type of physical examination on him. Dr. McAlister noted Plaintiff's fall in 2009 and Plaintiff's complaints of a history of a closed head injury and multiple joint injuries. *Defts' Exs.* E at 2 & D at 19-30. Dr. McAlister noted the diagnosis with Hepatitis C[3] and that he believed Plaintiff was aware of this condition. *Id.* Dr. McAlister enrolled Plaintiff in the chronic care program for Hepatitis C. *Id.* Plaintiff remained on chronic care until November 19, 2015, when he was told he did not have Hepatitis C. *Defts' Ex.* C at 43.

Dr. McAlister also noted that Plaintiff had generalized osteoarthritis and wanted Celebrex and mobic. *Defts' Exs.* E at 2 & D at 19-30. Dr. McAlister noted pain to abduction against resistance in Plaintiff's shoulder, with no edema or erythema bilaterally. *Id.* Dr. McAlister advised Plaintiff that both Celebrex and mobic should be avoided because of his Hepatitis C diagnosis. *Id.* Dr. McAlister advised Plaintiff that stretches and exercises should be tried first. *Id.*; *see also Defts' Ex.* C at 69.

According to Plaintiff, Dr. McAlister asked if the Plaintiff knew how many people were at the facility; gave Plaintiff some bending and stretching exercises to perform; and told the Plaintiff that his blood work would be scheduled. Plaintiff alleges he was told he was not healthy enough to be at the SWACCC.

Plaintiff testified that Dr. McAlister criticized his physical condition but wasn't going to treat him for anything. Plaintiff saw Dr. McAlister a total of three times. Plaintiff did not believe Dr. McAlister ever prescribed him any medication.

---

[3]Plaintiff's deposition was taken on February 16, 2016. At that time, Plaintiff testified he did not have Hepatitis C. *Defts' Ex.* C at 31.

Because he was no longer on the medication, Plaintiff testified he suffered increased pain in his joints as well as mental and emotional distress. He testified he had violent and sad thoughts and a wide range of emotions. He stated that his anguish had increased dramatically.

On May 19, 2014, Plaintiff was examined by psychiatrist Dr. Albert Kittrell. *Defts' Exs.* E at 2-3 & D at 37-38. Plaintiff was prescribed 100 milligrams of Zoloft. *Id.*

On May 29, 2014, Plaintiff was again seen by Dr. McAlister for complaints of joint pain. *Defts' Exs.* E at 3 & D at 40. Dr. McAlister noted that Plaintiff reported not keeping a log of his exercising. *Id.* Dr. McAlister again explained his reluctance to prescribe mobic or Celebrex because of the diagnosis of Hepatitis C. *Id.* Dr. McAlister explained these medication could cause an elevation in liver enzymes. *Id.* Dr. McAlister instructed Plaintiff to perform the exercises and keep a log. *Id.* Plaintiff was instructed to bring the log with him to his next examination. *Id.*

Plaintiff says he was only told to do the exercises and not to log them. *Defts' Ex.* C at 74. Further, Plaintiff stated he told Dr. McAlister that he could not do the exercises because they hurt. *Id.* After this visit, Plaintiff logged down every attempt he made to do the exercises. *Id.* at 75-76.

On July 17, 2014, Plaintiff was examined by Dr. Irvina Esteva for complaints of bilateral shoulder pain. *Defts' Exs.* E at 3 & D at 58. Dr. Esteva noted Plaintiff had a full range of motion of both shoulders and full strength bilaterally in all directions. *Id.* Plaintiff was negative for signs of a rotator cuff injury. *Id.* Dr. Esteva prescribed 400 milligrams of Ibuprofen, three times a day for four days. *Id.* Plaintiff testified he was satisfied with Dr. Esteva's care and treatment. *Defts' Ex.* C at 88-90.

At some unspecified date, Plaintiff was seen by Dr. Viegas. Plaintiff saw him twice. On one occasion, Dr. Viegas prescribed something for pain relief. However, the next time Plaintiff saw Dr. Viegas he stated he had been told by his boss "not to treat anyone for chronic pain any more when

the prescription Dr. Estava had [given the Plaintiff] ran out." *Defts' Ex.* C at 86-87.  Plaintiff testified that Dr. Viegas never said he did not need the medication.  Plaintiff did not file a grievance about Dr. Viegas' conduct.  *Id.* at 88.

After this, Plaintiff testified he had to submit sick call requests to obtain three days worth of aspirin which gave him some type of pain relief.  Plaintiff testified he submitted about seventy sick call requests.  Even then, sometimes he had to go a week or two to get the aspirin.

Connie Mason, Janet Myers, and HSA Wise all serve in administrative roles and do not have prescriptive authority.  *Defts' Ex.* E at 3 & C at 59-60.  However, in Plaintiff's view, they did have authority to respond to grievances and to direct others to provide treatment.  *Defts' Ex.* C at 83.

With respect to Janet Myers, Plaintiff testified she reviewed his records and told him "over and over" that is was acceptable for the doctors not to provide him with the medications he was on when at the SWACCC.   He testified she merely upheld the doctors decision that because of his Hepatitis C he should not be on either medication.  Plaintiff testified that she should have told the doctors to treat her for Hepatitis C.

Dr. Robert Floss reviewed the medical care provided the Plaintiff.  *Defts' Ex.* E at 4.  In Dr. Floss' opinion the care and treatment provided to the Plaintiff was appropriate and satisfactory for Plaintiff's complaints.  *Id.*

The ACC has a resident grievance procedure.  *Defts' Ex.* A.  The Policy requires a resident to first attempt to resolve the issue verbally.  *Id.*  If this fails, the resident is to submit a formal written grievance within five days of the occurrence of the incident.  *Id.* at 3, §(C)(1)(b).  Plaintiff testified he did not submit any grievances against Defendants, Connie Mason, Dr. Mark Viegas, or Janet Myers.  *Defts' Ex.* C at 88 & 90.

Plaintiff only submitted one grievance, number SWC14-11, prior to filing this lawsuit. *Defts'*

*Exs.* C at 47, 54-55 & B.  The grievance was submitted on June 5, 2015. *Defts' Ex.* B at 6.  It raised

three issues: (1) the failure to continue the medications he was on when transferred; (2) needing

cortisone shots for his shoulder, elbow, knee and hip joints; and (3) not receiving a prompt

evaluation. *Id.* at 6 & C at 23-.  Plaintiff testified that the only claim regarding his mental health

needs is against HSA Wise. *Id.* at 36-37.

The ACC Deputy Director for Residential Services issued a grievance appeal decision with

regard to grievance number SWC 14-11 on July 1, 2014. *Defts' Ex.* B.  He found that the issue

regarding the intake physical had been resolved. *Id.*  Further, he found no evidence to support

Plaintiff's allegations of deliberate indifference to Plaintiff's medical needs.

### (2).  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in

the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once

a party moving for summary judgment has made a sufficient showing, the burden rests with the non-

moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue

of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th

Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt

as to the material facts." Matsushita, 475 U.S. at 586.  "They must show there is sufficient evidence

to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient

to survive a motion for summary judgment." *Id.* (citing, <u>Metge v. Baehler</u>, 762 F.2d 621, 625 (8th Cir. 1985)).

### (3). Discussion

Defendants move for summary judgment on the following grounds: (1) Plaintiff did not exhaust his administrative grievances as to Connie Mason, Dr. Mark Viegas, and Janet Myers; (2) Plaintiff's claims should be limited to the time period covered by the one grievance he did exhaust his claims on; and (3) the care and treatment provided to the Plaintiff was appropriate and there is no evidence of deliberate indifference on the part of the Defendants.

### (A). Exhaustion of Administrative Remedies

The Prison Litigation Reform Act in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Exhaustion is mandatory.  <u>Porter v. Nussle</u>, 534 U.S. 516, 524-25 (2002).  In <u>Jones v. Bock</u>, 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules."  <u>Id</u>. at 218 (internal quotation marks and citation omitted).  The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  <u>Id</u>.

"[U]nder the plain language of section 1997(e)(a), an inmate must exhaust administrative remedies *before* filing suit in federal court . . .  if exhaustion was not completed at the time of filing, dismissal is mandatory."  <u>Johnson v. Jones</u>, 340 F.3d 624, 627 (8th Cir. 2003)(emphasis in original."

"[F]ailure to exhaust available administrative remedies is an affirmative defense, not a matter of subject matter jurisdiction." Lenz v. Wade, 490 F.3d 991, 993 n. 2 (8th Cir. 2007).

Defendants' grievance procedure requires the resident to first attempt to verbally resolve grievance through a counselor, the residential supervisor, or the shift supervisor. *Defts' Ex.* A at (C)(1)(a). If this fails, the resident may submit a formal written grievance within "five (5) days of the occurrence." *Id.* at (C)(1)(b). Absent an extension, the grievance officer or designee has thirty calendar days to respond in writing to the grievance. *Id.* at (C)(1)(g). The resident may appeal the center supervisor's decision within five days of receipt of the decision. *Id.* at (C)(2)(a). Absent an extension, the Deputy Director has thirty calendar days to review the initial decision. *Id.* at (C)(2)(c).

Plaintiff does not contend he was unaware of the grievance procedure or was in anyway prevented from using the procedure. Plaintiff failed to submit any grievances against Defendants, Connie Mason, Dr. Mark Viegas, or Janet Myers. *Defts' Ex.* C at 88 & 90. These Defendants are therefore entitled to summary judgment in their favor.

**(B). Limitation on Time Frame**

Plaintiff filed grievance SWC14-11 on June 5, 2014. His appeals were complete on July 1, 2014, with the issuance of the Deputy Director's grievance appeal decision on July 1, 2014. As the grievance procedure requires the grievance to be filed within five days of the occurrence, Defendants argue that the broadest possible time period for administratively exhausted claims remaining in this lawsuit, is from April 23, 2014, Plaintiff's date of entry into the SWACCC, until July 1, 2014.

Defendants cite to no case law holding that the final administrative decision is, in effect, a limitation or end point of any claims addressed in the grievance. Many claims asserted are by their very nature continuing violations. For example, if an inmate claimed he was not being provided with a diet in accordance with his religion, it would make little sense to require the inmate to continue to

submit grievances on this issue when the issue had already been addressed and there was no change in circumstances.

Here, Plaintiff claims that the Defendants refused to supply him with the prescription medications he was on prior to his incarceration in the ACC. If the date of the final decision acts as the cut-off date for the claim, Plaintiff would have to file repeated grievances regarding the same issue. The purpose of the exhaustion requirement is to allow the prison an opportunity to address and resolve the issue before resort to the courts. When a grievance "identifies a specific and continuing complaint that ultimately becomes the basis for a lawsuit," a single grievance sufficiently exhausts administrative remedies as to this issue. Johnson v. Killian, 680 F.3d 234, 239 (2nd Cir. 2012)

In this case, Defendants did not provide Plaintiff with the prescription medications he was on when he was transferred to the ACC. Their decision did not change after July 1, 2014. *Id.* at 238-239 (The 2007 claim about the spaces and times allotted for congregational prayer was identical to the issue he exhausted in 2005. Court held that 2005 grievance was sufficient to exhaust his administrative remedies with respect to continuing limitations on congregational prayer); see e.g., Ellis v. Vadlamudi, 568 F. Supp. 2d 778, 521 (E.D. Mich. 2008)(Analogy to the continuing violations doctrine applicable to statute of limitations issues. Grievance considered timely when Plaintiff has alleged the existence of a chronic ongoing medical condition and Defendants "learned he had a condition warranting medical attention yet unreasonably refused to provide that attention."); Sutton v. Wright, 265 F. Supp. 2d 292, 295-99 (S.D.N.Y. 2003)(holding that two grievances filed during the course of a several-year period of repeated delays in treating an inmate's injured knee sufficed to exhaust the entire course of conduct, despite the prison system's rule that grievances must be filed within fourteen days of an occurrence); Aiello v. Litscher, 104 F. Supp. 2d 1068, 1074

(W.D. Wis. 2000)(holding that when inmates have filed a grievance regarding a prison policy, they need not file grievances regarding subsequent incidents in which the policy is applied); White v. Velie, No. 9:15-cv-88, 2015 WL 10567827, *7 (N.D.N.Y. Dec. 15, 2015)(distinguishing *Johnson* when the claims involve a specific instance of the alleged use of excessive force by defendant and specific instances of the alleged denial of medical care which plaintiff did not exhaust. "The fact that plaintiff has previously raised excessive force or medical care claims does not excuse him from exhausting all future claims based on medical care or excessive force"); see also White v. Williams, No. 912-cv-1892, 2016WL 1237712, *7 (N.D.N.Y. Jan. 1, 2016)(distinguishing *Johnson* on the grounds it involved the same policy and the substantive issues would be the same whereas the action before it involved specific allegations related to the assignment of an inmate to the plaintiff's cell and specific instances of the alleged denial of medical care); cf. Eichler v. Tilton, No. Civ. S-06-2984, 2009 WL 188783 (E.D. Cal. Jan. 27, 2009)(rejecting the idea that plaintiff was required to file an inmate grievance, during each administrator's tenure in order to meet the PLRA's exhaustion requirement). Under the particular facts of this case, we decline to hold that the decision at the final appeal step of the grievance procedure terminates or limits the Plaintiff's claim.

### (C). Denial of Medical Care

"Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." Crooks v. Nix, 872 F.2d 800, 804 (8th Cir. 1989)(citing Estelle v. Gamble, 429 U.S. 97, 103 (1976)). The Eighth Amendment deliberate indifference standard applies to all denial of medical care claims. Carpenter v. Gage, 686 F.3d 644, 650 (8th Cir. 2012). The deliberate indifference standard has both an objective and a subjective component. Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997). A plaintiff must demonstrate that (1) he suffered an objectively serious medical need; and (2) the defendant actually knew of the medical need but,

subjectively, was deliberately indifferent to it.  Grayson v. Ross, 454 F.3d 802, 808-09 (8th Cir. 2006).

### (1).  Psychiatric Medication

The Defendants first argument is that they are not liable on Plaintiff's psychiatric medication claims.  They state that he was examined by non-party psychiatrist, Dr. Albert Kittrell, on May 19th and prescribed Zoloft.  They contend this was an appropriate and timely examination and that Plaintiff was prescribed an appropriate medication.

Prozac has warnings against suddenly stopping it.  Specifically, the warnings for Prozac (fluoxetine) states:

> Do not stop taking fluoxetine without talking to your doctor.  If you suddenly stop taking fluoxetine, you may experience withdrawal symptoms such as mood changes, irritability, agitation, dizziness, numbness or tingling in the hands or feet, anxiety, confusion, headache, tiredness, and difficulty falling asleep or staying asleep.  Your doctor will decrease your dose gradually.

https://medlineplus.gov/druginfo/meds/a689006.html (accessed January 20, 2017).

Many of the facts in this case are undisputed.  It is undisputed that the Plaintiff had a valid current prescription for Prozac when he was booked into the SWACCC.  It is undisputed that he brought the medications, including Prozac, to the jail with him when he was booked in.  It is undisputed that Plaintiff's medications were abruptly discontinued when he was booked in. Although seen by a nurse the day after he was booked in, there is no suggestion that she, or anyone else on the medical staff, recognized, or gave consideration to, the possibility of the Plaintiff suffering withdrawal symptoms due to the abrupt discontinuation of the various medications.  No determination was made as to whether or not it was medically safe for the Plaintiff to be taken off Prozac, or indeed all his prescription medication.

He was not seen by a medical doctor until May 16, 2014.  He was not seen by a psychiatrist until May 19, 2014.  I believe there are genuine issues of material fact as to whether Dr. McAlister, the staff medical doctor, exhibited deliberate indifference to Plaintiff's serious medical needs when he failed to exercise professional judgment in determining whether the Prozac should be abruptly discontinued instead of gradually weaning the Plaintiff off these medications.

### (2).  Non-Psychiatric Medication

Similarly, there was no exercise of medical judgment used with respect to the discontinuation of the remaining medications, they were just abruptly terminated and Plaintiff was not medically evaluated until he was seen by Dr. McAlister on May 16th.  There is no dispute that Plaintiff suffered from chronic pain, Hepatitis C, and had been diagnosed with GERD.  At his initial medical examination by Nurse Frye, Plaintiff requested his medications and was told he would need to be seen by the doctor.  I believe there are genuine issues of fact as to whether the abrupt discontinuation of the medication, without the exercise of medical judgment, constituted deliberate indifference to Plaintiff's serious medical needs.

### (3).  Defendant HSA Wise

Defendants also argue that HSA Wise is in a purely administrative position and does not have prescriptive authority.  They maintain Plaintiff's claim against HSA Wise is improperly grounded in the theory of *respondeat superior*.

A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability.  See Monell v. Department of Social Services, 436 U.S. 654, 694 (1978).  "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity."  White v. Holmes,  21 F.3d 277, 280 (8th Cir. 1994); see also Whitson v. Stone County

Jail, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted); Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability").

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights."  Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007) (quoting Mayorga v. Missouri, 442 F.3d 1128, 1132 (8th Cir. 2006)); Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) (no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); Mark v. Nix, 983 F.2d 138, 139-40 (8th Cir. 1993) (section 1983 liability requires some personal involvement or responsibility).  Here, Plaintiff has established no causal link or direct responsibility of HSA Wise to the alleged deprivation of rights.  HSA Wise, as a non-medical professional, is not personally liable for his medical staff's treatment decisions. Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002).

**(4).  Conclusion**

For the reasons stated, I recommend that Defendants' Summary Judgment Motion (ECF No. 44) be **GRANTED IN PART AND DENIED IN PART.**  Specifically, I recommend it be granted as to all claims against Connie Mason, Dr. Mark Viegas, Janet Myers, and Roger Wise.  The claims against Dr. McAlister should proceed to trial.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **25th day of January 2017.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE